# 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 𝕮𝕠𝕦𝕣𝕥 𝕠𝕗 𝕬𝕡𝕡𝕖𝕒𝕝𝕤
# 𝕱𝕠𝕣 𝕿𝕙𝕖 𝕿𝕖𝕟𝕥𝕙 𝕮𝕚�londrcuit

_____

## UHS OF DELAWARE, INC.,
Petitioner,

And

## CEDAR SPRINGS HOSPITAL, INC., d/b/a CEDAR SPRINGS HOSPITAL,
Petitioner,

v.

## OCCUPATIONAL HEALTH AND SAFETY REVIEW COMMISSION
and SECRETARY OF LABOR,
Respondents.
_____

On a Petition for Review of the February 5, 2024 Final Order of the
Occupational Health and Safety Review Commission, OSHRC No. 20-0887,
declining discretionary review of the decision of Administrative Law Judge
Christoper D. Helmes, dated December 11, 2023.
_____

## REPLY BRIEF FOR THE PETITIONER,
## UHS OF DELAWARE, INC.
_____

Kip Adams, Esq.
Patricia B. Gary, Esq.
**LEWIS, BRISBOIS, BISGAARD &
SMITH LLP**
60 State Street, 23rd Floor
Boston, MA 02109
T: (857) 313-3950
Kip.Adams@lewisbrisbois.com
Patricia.Gary@lewisbrisbois.com

*Attorneys for Petitioner UHS of Delaware, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT OF THE ISSUE ............................................................................. 1

ARGUMENT ......................................................................................................... 2

I.  THE SECRETARY'S BRIEF MISSTATES THE FACTS IN THE
    RECORD, BUT EXAMINATION OF THE  EVIDENCE
    SHOWS THAT THE SINGLE-EMPLOYER TEST WAS NOT MET ............. 2

A.  THE ALJ DEPARTED FROM THE COMMISSION'S
    RECOGNIZED ANALYSIS FOR DETERMINING
    SINGLE-EMPLOYER STATUS. ..................................................................... 2

B.  THE THREE-PART SINGLE EMPLOYER TEST IS NOT MET ................... 4

    1.  UHS-DE and Cedar Springs Do Not Share a Common Worksite. ............... 4

    2.  There Is No Evidence That UHS-DE And Cedar Springs Are  Interrelated
        And Integrated With Respect To Safety And Health Matters..................... 12

        a.  Independent Operations for Unrelated Purposes.................................. 13

        b.  Safety Matters...................................................................................... 15

    3.  UHS-DE And Cedar Springs Do Not Share Common Management,
        Supervision, Or Ownership. ...................................................................... 20

II.  THE COMMISSION IGNORED THE "NECESSARY CONTEXT." ............ 23

ADOPTION OF CEDAR SPRING'S REPLY BRIEF ........................................ 27

CONCLUSION.................................................................................................... 27

CERTIFICATE OF COMPLIANCE.................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

A.C. Castle Constr. Co. v. Acosta,

882 F.3d 34 (1st Cir. 2018)....................................................................................19

Advance Specialty Co.,

No. 2279, 1976 OSAHRC LEXIS 678 (Mar. 5, 1976) ....................................3, 12

Altor, Inc.,

No. 99-0958, 2011 OSAHRC LEXIS 29 (Apr. 26, 2011) ..................................8, 9

Am. Dental Ass'n v. Sec'y of Labor,

984 F.2d 823 (7th Cir. 1993) .................................................................................26

C&W Facility Servs. v. Sec'y of Labor,

22 F. 4th 1284 (11th Cir. 2022) ...............................................................................3

C.T. Taylor Co.,

No. 94-3241, 2003 OSAHRC LEXIS 43 (Apr. 26, 2003) .......... 7, 8, 9, 10, 15, 19

Daniel v. OSHRC,

295 F.3d 1232  (11th Cir. 2002) ..............................................................................3

Delek Ref., Ltd. v. OSHRC,

845 F.3d 170 (5th Cir. 2016) .................................................................................11

Delek Ref., Ltd.,

No. 08-1386, 2015 OSAHRC LEXIS 18 (Apr. 23, 2015) ....................................12

Fabricated Metal Prods.,

No. 93-1853, 1997 OSAHRC LEXIS 118 (Nov. 7, 1997)....................................11

Frank v. U.S. West, Inc.,

   3 F.3d 1357 (10th Cir. 1993) ...............................................................18

FreightCar Am., Inc.,

   No. 18-0970, 2021 OSAHRC LEXIS 28 (Mar. 3, 2021) ........... 2, 4, 7, 10, 23, 24

J.A.M. Builders, Inc. v. Herman,

   233 F.3d 1350 (11th Cir. 2000) ..............................................................3

Johnson v. Flowers Indus., Inc.,

   814 F.2d 978 (4th Cir. 1987) ...............................................................18

Loretto-Oswego Residential Health Care Facility,

   No. 02-1164, 2011 OSAHRC LEXIS 1 (Jan. 7, 2011) ............................................

   ....................................................... 2, 6, 7, 10, 12, 13, 14, 15, 16, 19, 22

Lusk v. Foxmeyer Health Corp.,

   129 F.3d 773 (5th Cir. 1997) ...............................................................20

Phoenix Roofing, Inc.,

   No. 90-2148, 1995 OSAHRC LEXIS 13 (Feb. 24, 1995)...................................11

UHS of Westwood Pembroke Inc. v. OSHRC,

   No. 22-1845,  2023 U.S. App. LEXIS 10930

(3d Cir. May 4, 2023)................................................... 8, 9, 10, 13, 19, 21

Vergona Crane Co.,

   No. 88-1745, 1992 OSAHRC LEXIS 96 (July 22, 1992) .....................................8,

**Statutes**

29 U.S.C. § 660(a) ...........................................................................2

29 U.S.C. §§ 651-678...........................................................................1

## STATEMENT OF THE ISSUE

Whether the ALJ's determination that Petitioners, UHS-DE and Cedar Springs, are a "single employer" for purposes of liability under the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. §§ 651-678, is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with the law, and unsupported by substantial evidence—where UHS-DE, a management-services company, and Cedar Springs, an in-patient psychiatric hospital: (A) have separate worksites and principal places of business; (B) fulfill different roles and functions; and (C) have different management and employees, do not share in each other's profits, and observe all required corporate formalities.[1]

---

[1] Cedar Springs' Reply Brief addresses separate issues, and pursuant to Fed. R. App. P. 28, UHS-DE adopts Cedar Spring's arguments regarding these issues.

<u>**ARGUMENT**</u>

I. **THE SECRETARY'S BRIEF MISSTATES THE FACTS IN THE RECORD, BUT EXAMINATION OF THE  EVIDENCE SHOWS THAT THE SINGLE-EMPLOYER TEST WAS NOT MET**

    A. **The ALJ Departed From The Commission's Recognized Analysis For Determining Single-Employer Status.**

The Commission's single-employer test assesses whether two entities should

be treated as a single employer for purposes of the OSH Act require the following:

> Commission precedent hold[s] that "related employers are regarded as a single entity where … they [**A**] share a common worksite, [**B**] have interrelated and integrated operations, and [**C**] share a common president, management, supervision, or ownership."

*FreightCar Am., Inc.*, No. 18-0970, 2021 OSAHRC LEXIS 28, at *8-12 (Mar. 3,

2021) (citing *Loretto-Oswego Residential Health Care Facility*, No. 02-1164, 2011

OSAHRC LEXIS 1 (Jan. 7, 2011), *aff'd*, 692 F.3d 65 (2d Cir. 2012) (finding that a

single-employer relationship was not established where entities "shared the same

president, chief executive officer, and chief financial officer" and there was some

evidence that these companies interacted on safety and health matters, but they did

not share a common worksite and the record did not show that the companies

"handled safety matters as one company"). All three factors must be present for two

separate employers to be regarded as a single entity. *FreightCar*, 2021 OSAHRC

LEXIS 28, at *12.  No factor alone is sufficient to find single-employer status; rather,

the factors must be reviewed together.  Indeed, the Commission deems two separate

companies a single employer <u>only</u> when they: (A) "share a common worksite such that the employees of both have access to the same hazardous conditions," (B) "have interrelated and integrated operations," and (C) "share a common president, management, supervision or ownership." *Advance Specialty Co.*, No. 2279, 1976 OSAHRC LEXIS 678, at *13 (Mar. 5, 1976).

As previously stated in UHS-DE's opening Brief, this Court should reverse the ALJ Dec. because at best, there is only a scintilla of evidence regarding any of the three single-employer prongs. 29 U.S.C. § 660(a); *Daniel v. OSHRC*, 295 F.3d 1232, 1236 (11th Cir. 2002). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *C&W Facility Servs. v. Sec'y of Labor*, 22 F. 4th 1284, 1287 (11th Cir. 2022) (citing *J.A.M. Builders, Inc. v. Herman*, 233 F.3d 1350, 1352 (11th Cir. 2000) (internal quotation marks omitted)). The citations in the Secretary's Brief, when checked for accuracy demonstrate that, indeed, they are *not accurate*, and contain at best only a scintilla of evidence, but the Secretary overstates, inflates and embellishes the scintilla of evidence. For example, the Secretary cites to a few emails, in which a UHS-DE employee inquired about an incident of workplace violence, and characterizes the emails as UHS-DE "compiling trend data for the facility regarding patient-on-staff aggression." *See* Secretary Brief, p. 10. There is no evidence to support this statement. The record does not support the

Commission's determination that UHS-DE and Cedar Springs are a single employer. In cases where the Commission has held that entities are a single employer, the facts demonstrated a much closer relationship between the two entities at issue than in this case.

The record must be viewed in the "necessary context," including whether the entities are "affiliated enterprises" with a "common brand name" rather than a single employer. *FreightCar*, 2021 OSAHRC LEXIS 28, at *14-15. Under the three-part test, there is insufficient evidence of the requisite relationship between UHS-DE and Cedar Springs to find that they are a single employer.

### B.   The Three-Part Single Employer Test Is Not Met

#### 1.   UHS-DE and Cedar Springs Do Not Share a Common Worksite.

The ALJ's determination that UHS-DE and are a single employer fails on the first factor, because UHS-DE and Cedar Springs clearly did not share a common worksite. As a preliminary matter, the Secretary's Brief completely ignores the undisputed fact that UHS-DE and Cedar Springs operate from different worksites and do not otherwise share a common worksite, as UHS-DE and Cedar Springs are not even located in the same state. The parties entered into Stipulations of Fact that Cedar Springs Hospital is located at 2135 Southgate Road, Colorado Springs, CO, and all of its clinical services are administered from that location. (Stip. 3, 4.) Conversely, UHS-DE is headquartered in King of Prussia, Pennsylvania. (Stip. 19.)

The parties also stipulated that "UHS-DE does not own the property where Cedar Springs Hospital is located." (Stip. 49.) And the Management Agreement between UHS-DE and Cedar Springs indicates that Cedar Springs "owns" a behavioral health facility in Colorado. (Ex. C-84). Thus, there is no question that UHS-DE and Cedar Springs lack a "common physical work site." The distance between UHS-DE's offices and Cedar Springs Hospital is 1,699 miles. (Tr. 2907-2908, 2914-2915; UHS-R-6).

Nevertheless, the Secretary parrots the erroneous ALJ Dec. which concludes that even if two entities have different principal addresses and perform their primary work at different locations, they can still share a common worksite within the meaning of the first factor, if UHS-DE employees hold key supervisory positions. ALJ Dec. at 144. The ALJ Decision reasons that even though "Cedar Springs employed most of the on-site personnel", *id.* at 144, the CEO of Cedar Springs was a UHS-DE employee and "was the direct supervisor of multiple people at the Worksite, including the CFO, the Director of Risk Management, the Director of Admissions and Referrals, the Human Resources Director, and the Director of Plant Operations.[2] ALJ Dec. at 144. However, the record shows that David Franklin was the CEO of Cedar Springs from September 2019 to January 2021, and during the time he was the CEO of Cedar Springs, Mr. Franklin did not hold any corporate level

---

[2] (Stip. 21, 25, Tr. 1919-20, 1981).

positions at UHS-DE, did not serve on UHS-DE's board, and did not supervise any UHS-DE employees who worked at places other than Cedar Springs Hospital (Tr. 1917-1918, 2908-2909). Brandon Askew was the CFO of Cedar Springs from March 2017 to June 2020, and while he was CFO Mr. Askew did not hold any corporate level positions at UHS-DE, did not serve on UHS-DE's board, and did not supervise any UHS-DE employees (Tr. 1979, 2071-2072). But the fact that the Cedar Springs CEO and CFO are employees of UHS-DE does not mean that Cedar Springs and UHS-DE share a common worksite. The UHS-DE employees who perform work for Cedar Springs (the CEO and CFO) have no role in UHS-DE's management or corporate structure and do not work at UHS-DE's corporate headquarters. Thus, there is no common worksite between UHS-DE and Cedar Springs.

Accordingly, the first single-employer factor is lacking. Here, as in *Loretto-Oswego*, even though Cedar Spring's CEO and CFO were employed by UHS-DE and worked in offices in the administrative section of the hospital, this Court should apply the Commission's own prior precedents and find that "this 'outward appearance of a common identity'" gives way "upon a closer look." *Loretto-Oswego*, 692 F.3d at 71. The ALJ inexplicably found that Cedar Springs and UHS-DE share a common worksite, based solely on the fact that Cedar Springs' CEO and CFO worked at Cedar Springs but were employed by UHS-DE. The ALJ erred

because this reasoning cannot satisfy the common-worksite factor under long-standing Commission precedent, including the recent *FreightCar* decision, which catalogued and applied past precedents (including *Loretto-Oswego*).

The two companies at issue in *FreightCar* shared the same corporate headquarters in Chicago, Illinois. *FreightCar*, 2021 OSAHRC LEXIS 28, at \*14. Nevertheless, the Commission found that "the record does not show that the companies share the worksite at issue." *Id.* (internal quotations omitted). Similarly, in *Loretto-Oswego*, the Commission concluded that a management company, LMC, did not share a common worksite despite the fact that the CEO and president of LMC and Loretto-Oswego were the <u>same</u>. 2011 OSAHRC LEXIS 1, at \*13.

Here, there is even <u>less</u> evidence of sharing a common worksite because it is undisputed that Cedar Springs and UHS-DE lack common "C-Suite" leadership. UHS-DE maintains its own, completely separate, CEO, CFO, and management group (Tr. 2071-2072, 2908-2909). Put another way, Cedar Springs' CEO and CFO (even if UHS-DE employees) are not shared by UHS-DE in its own management structure because the Cedar Springs CEO and CFO have no managerial or "C-suite" duties for UHS-DE.

That fact strongly distinguishes this case from those in which the Commission has properly determined that the common-worksite factor was met. For example, in *C.T. Taylor*, the Commission found that the two entities at issue had a common

worksite because they operated out of the same physical location and also because they shared the same CEO. *C.T. Taylor Co.*, No. 94-3241, 2003 OSAHRC LEXIS 43, at *5, *32 (Apr. 26, 2003) (finding that "both companies are owned and controlled by Charles Taylor. They operate from the same office. Esprit's financial, payroll, and workers compensation recordkeeping is performed by Taylor."); *Vergona Crane Co.*, No. 88-1745, 1992 OSAHRC LEXIS 96, *3 (July 22, 1992) (finding a common worksite where "the two companies operated out of the same office"). Those cases are in stark contrast to the present case, where Cedar Springs and UHS-DE not only do not share the same location, they lack overlapping management.

The Secretary's Brief parrots the ALJ Dec. by citing to the Third Circuit's unpublished decision in *UHS of Westwood Pembroke Inc. v. OSHRC*, No. 22-1845, 2023 U.S. App. LEXIS 10930 (3d Cir. May 4, 2023) (hereinafter "*Pembroke*") as authority. However as UHS-DE emphasized in its opening Brief, *Pembroke*'s facts are easily distinguishable, because there, the Third Circuit found that "UHS-DE's Loss Control Manager worked onsite at Pembroke" and was "integrally involved in the hospital's day-to-day operations." *Id.* at *3. Thus, in *Pembroke*—with materially **different** facts at issue—the Third Circuit reasoned that *Altor, Inc.*, No. 99-0958, 2011 OSAHRC LEXIS 29, at *1 (Apr. 26, 2011), was a similar controlling case.

In *Altor*, the Commission found a common worksite where one company's president provided "daily supervision" at the worksite of another. *Id.* at *16. Similarly, in *C.T. Taylor*, the "handpicked" supervisor was a management-level employee for <u>both</u> entities. The entities performed <u>all</u> their operations out of the same office, and employees of both entities, including the supervisor, were actually exposed to the cited hazard. *C.T. Taylor*, 2003 OSAHRC LEXIS 43, at *13-14. Simply put, *Pembroke* and *C.T. Taylor* are both distinguishable from this case because here, there is no shared or common employee performing the same duties for both entities. The Secretary fails to confront these factual dissimilarities, tries to sweep them under the rug, and in essence, asks this Court to hold that in every case where UHS-DE offers management services to a psychiatric hospital, the fact that there are glaringly different facts does not matter. Instead, the Secretary is entitled to declare the two entities a "Single Employer" based upon the *Pembroke* decision. In other words, the only fact that matters is that UHS-DE is a defendant.

As noted, in *Pembroke*, the UHS-DE Loss Control Manager was regularly onsite at the hospital to participate in aggression reduction team meetings, a fact which is not present here. More incredulously, in an effort to meet the Single Employer test, the Secretary's Brief makes wildly unsupported statements such as "the substantial evidence in the record shows that UHS-DE and Cedar Springs "handled safety matters" at the hospital "as one company." *See* Secretary's Brief, p.

26. Incredibly, the Secretary fails to cite to any record evidence for this bold and completely false statement.

This Court should hold that—under established Commission precedents—the two entities lack a common worksite, as a matter of law. *See FreightCar*, 2021 OSAHRC LEXIS 28, at *12-22; *Loretto-Oswego*, 692 F.3d at 73. Further, even though "mutual employee access to a hazard is not a precondition to establishing the common worksite factor," *Pembroke*, 2023 U.S. App. LEXIS at *3, the ALJ's Decision reasons that "[t]he CFO was often at the Worksite, including in the patient care units." ALJ Dec. at 144. However, by contrast to *Pembroke*, there is no evidence that the CEO or CFO "interacts with patients." Moreover, unlike the supervisor in *C.T. Taylor*, the CEO is not actually exposed to the cited hazard (patient-to-staff violence) because he is <u>not</u> involved with patients' clinical care and does not interact with the patients himself. Indeed, UHS-DE did not employ anyone at Cedar Springs who provided care to patients and UHS-DE's relationship with Cedar Springs did not extend to the delivery of care to patients at Cedar Springs Hospital. (Tr. 346-350, 2903, Stip. 51). Accordingly, the ALJ erred.

Since UHS-DE employees had absolutely no role in clinical care, the risk of harm from patient-related workplace violence, and specifically patient-to-staff aggression—is purely theoretical. Indeed, it is no greater to the CFO than any other individual who happened to be on the unit, such as a surveyor or visitor. The mere

theoretical possibility of exposure is insufficient. *Fabricated Metal Prods.*, No. 93-1853, 1997 OSAHRC LEXIS 118, at *9 (Nov. 7, 1997) ("the inquiry is not simply into whether exposure is theoretically possible"). None of the incidents of workplace violence involved a UHS-DE employee. To highlight this point, in the over 53 pages of the ALJ's Decision devoted to a discussion of the alleged incidents of workplace violence at Cedar Springs, there is not one reference to any UHS-DE employee having been exposed to the hazard of workplace violence. *See* ALJ Dec. at 6-29, 64-94. Instead, the record is crystal clear that all of the employees who were exposed to the alleged hazard were patient-care employees of Cedar Springs. This is because only Cedar Springs employees manage clinical care and administer patient treatment. (Tr. 348-349, 1919, 2905-2906, Stip.51), and the only two UHS-DE employees at Cedar Springs, the CEO and CFO, do <u>not</u> manage clinical care or treat patients. The Secretary's suggestion that the CEO supervised "a number of [administrative and non-medical] Cedar Springs employees" is insufficient to show that the companies shared the worksite.

There is no record evidence that any UHS-DE employees were in the vicinity of aggressive patients such that it was "reasonably predictable" that they would be exposed to the hazard of workplace violence. *Phoenix Roofing, Inc.*, No. 90-2148, 1995 OSAHRC LEXIS 13, at *10 (Feb. 24, 1995), *aff'd*, 79 F.3d 1146 (5th Cir. 1996); *Delek Ref., Ltd.*, No. 08-1386, 2015 OSAHRC LEXIS 18, at *34 (Apr. 23,

2015) ("Although this testimony shows how close an employee <u>could</u> get to these machines, it does not establish how close any employee <u>actually came</u> to the zone of danger, either as their work required or through inadvertence."), *aff'd in part and vacated in part on other issues*, 845 F.3d 170 (5th Cir. 2016).  In sum, the substantial weight of the evidence shows that Element one was not met because UHS-DE and Cedar Springs do <u>not</u> share a common worksite.

### 2. There Is No Evidence That UHS-DE And Cedar Springs Are Interrelated And Integrated With Respect To Safety And Health Matters.

The Secretary's Brief acknowledges that to establish single employer liability, the second factor requires the Secretary to show that UHS-DE and Cedar Springs handle safety matters as one company.  However, in an effort to do so, once again, the Secretary cherry-picks facts, mis-states them out of context, and blows out of proportion the tiny sliver of evidence that UHS-DE had knowledge of Cedar Springs' handling of safety matters, and provided some limited advice to Cedar Springs, such as a template for its workplace violence prevention plan ("WVPP"). *Loretto-Oswego*, 2011 OSAHRC LEXIS 1, at *5; *Advance Specialty Co.*, 1976 OSAHRC LEXIS 678, at *13-14.  Simply put, what the Secretary characterizes as "extensive evidence in the record that UHS-DE and Cedar Springs were interrelated and integrated with respect to employee safety and health matters", is in reality merely a scintilla of evidence.  *See* Secretary's Brief, p. 2 ("extensive evidence

shows that the two entities worked hand-in-hand to address employee safety at Cedar Springs"). This Court should check the Secretary's citations and reject the Secretary's efforts to blatantly mis-state the record evidence. The fact that workplace violence existed at Cedar Springs, as it did at *Pembroke*, does not automatically make UHS-DE and Cedar Springs a single employer.

### a. Independent Operations for Unrelated Purposes

First, UHS-DE and Cedar Springs are completely separate corporations that perform entirely different functions for unrelated purposes and maintain independent operations. (Stip., ¶¶ 3, 28, 47-48, 50-51; C-84, Background Section, ¶¶ A-B; Tr. 346-350, 2903, 2913-2914). The Secretary's Brief argues, erroneously, that UHS-DE and Cedar Springs are interrelated and integrated operations because under the Management Agreement, UHS-DE handles administrative matters for Cedar Springs, including the handling of Cedar Spring's finances, and preparing the annual capital and operating budgets, and administering the systems for payroll and benefits. *See* Secretary's Brief, p. 37. Under the Secretary's rationale, and under the ALJ's Dec., if a company provides back of the house services to another company—administrative in nature and not the second company's core business—the two entities are automatically "integrated and interrelated operations."

Absent extensive integration, the Commission has found this second factor lacking. In *Loretto-Oswego*, the Commission found that the nursing home was a

separate employer from the management company, even though the management company had initiated a safety-control plan at the nursing home, had hiring and firing authority, provided training to nursing-home employees, participated in negotiations with OSHA inspectors, prepared and monitored budgets and finances, and provided executive leadership. *Loretto-Oswego*, 2011 OSAHRC LEXIS 1, at *1-13. Similarly, in *Southern Scrap*, the Commission noted that the parent company's corporate safety director "was involved with safety at all of the scrap yards" affiliated with the parent—including by "draft[ing] [their] safety program[s]" and "maintain[ing] records on work-related injuries and illnesses." 2011 OSAHRC LEXIS 91, at *106. Nevertheless, the Commission found that the parent was not "interrelated [and] integrated" with those affiliates because there was no evidence that "the safety director had authority … to implement that program or to control other operational decisions affecting safety and health." *Id.* at *107-08. As in *Loretto-Oswego*, UHS-DE had authority for budgets and hiring and provided management services, but it was Cedar Spring's medical director—and not a UHS-DE employee—who managed patient care and had authority over clinical and staffing decisions. Mr. Franklin and Mr. Askew, the UHS-DE employees who served as CEO and CFO at Cedar Springs Hospital during the relevant time period, do not have medical licenses, (Stip., ¶¶ 21, 26, Tr. 1917-1918, 1979-1980, 2069-2070, 2903), and UHS-DE did not employ anyone at Cedar Springs Hospital who provided

medical care to patients (Stip. ¶ 51, Tr. 346-350, 1919, 1979-1980, 2069-2070, 2903, 2905-2906).

### b. Safety Matters

Ultimately, the "single employer inquiry turns on whether the entities in question handled safety matters as one company." *Loretto-Oswego*, 692 F.3d at 76 (quoting *C.T. Taylor*, 2003 OSAHRC LEXIS 43, at \*4) (internal quotation marks omitted). The record is clear that UHS-DE and Cedar Springs do not handle safety matters as one company. With respect to the hazard at issue in this case, Cedar Springs Hospital created and implemented its own WVPP. (Tr. 145, 1815-1817; C-22). Ms. Kolln, Cedar Springs Hospital's Director of Performance Improvement and Risk Management, was involved in creating the WVPP for Cedar Springs Hospital and has responsibility for it. (Tr. 1815-1817, 1822). The policy makes no mention of UHS-DE and was copyrighted by Cedar Springs Hospital. (Tr. 351-352; *see also*, C-22.). The ALJ Dec. ignores these facts, and cherry-picks different ones, to conclude that the two entities are interrelated. For example, the ALJ Dec. reasons that "UHS-DE required the Worksite to have a WVPP and provided a template." ALJ Dec., p. 151.

The ALJ Dec. fails to acknowledge that UHS-DE's role with respect to the WVPP was simply providing a template for the plan and some sample plans for Cedar Springs Hospital to review and tailor or reject as desired. (Tr. 127, 1816-

1819; C-27). But the templates were just that—templates that Cedar Springs could "tailor" as it saw fit. (Tr. 127). UHS-DE also provided Cedar Springs Hospital sample training materials, which UHS-DE's Group Loss Control Manager, Susan Wilde, made clear were "*EXAMPLES*" that Cedar Springs Hospital was free to "adopt/tweak" or disregard altogether in favor of different materials the hospital created entirely on its own. (Tr. 1816-1819; C-27). That is not enough to establish interrelated and integrated safety and health matters. *See Southern Scrap*, 2011 OSAHRC LEXIS 91, at *106 (finding that the two entities at issue, Southern Holdings and Houma, did not handle safety matters as one even though Southern Holdings drafted the safety program used by Houma because "the record contains little evidence regarding the extent of [Southern Holding's] authority at Houma to implement the program or to control other operational decisions affecting safety and health"). The fact that UHS-DE provided template policies and guidance to Cedar Springs Hospital is, as the Commission has found, "nothing more than resource sharing rather than the level of integration necessary to show a single-employer relationship." *Loretto-Oswego*, 2011 OSAHRC LEXIS 1, at *9-10. Indeed, the substantial benefits gained from the ability to share these resources across multiple

companies would be chilled if a single employer relationship was created by this sort of arrangement.[3]

In another blatant misstatement of the record evidence, the Secretary's Brief argues that a "UHS-DE employee also sometimes compiled trend data regarding injuries to staff members, and in once [sic] case presented that data to Cedar Springs Management." *See* Secretary's Brief, p. 33. *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362-63 (10th Cir. 1993) ("the fact that one of the parent's employees is an occasional consultant [to subsidiary] … is not evidence of interrelated operations"). The Secretary's citations, when checked, belie that UHS-DE neither compiled trend data or provided it to Cedar Springs Management. The fact that UHS-DE hired a contractor, Sedwick, on behalf of Cedar Springs was simply part of UHS-DE's administrative role. The Secretary's Brief and the ALJ Dec. both fail to acknowledge that the incident report reviews were carried out by Ms. Kolln and Ms. Mattson, Cedar Spring Hospital's Director of Nursing, and Ms. Kolln also performed the incident trending required under the WVPP. (Tr. 1823, 2415, 2521-2522, 2769-

---

[3] The purpose and intent of the WVPP was to "provide a safe and healthy workplace for all staff and to recognize that workplace violence is a safety and health hazard." (C-22, Program Elements Section). The WVPP set forth a "Zero Tolerance Policy" for all types of workplace violence, including, among others, "violence committed by patients upon staff members," and set a goal of "[a]ttain[ing] a 15% reduction in staff injuries related to patient aggression over 2018." (C-22, Purpose Section; C-22, Program Elements Section, ¶ A(1)).

2773). Trends of patient-to-staff aggression were discussed at the Performance Improvement Committee meetings, and the Seclusion & Restraint Performance Improvement Team focused its efforts on reduction of restraints and seclusions at the facility given the risk of injury they posed to both staff and patients. (Tr. 1825-1826, 2520-2521, 2525-2527, 2604, 2784-2791). The ALJ Decision also fails to acknowledge the myriad of record evidence that Cedar Springs' policies were copyrighted by Cedar Springs, and training was provided to employees on those policies by Ms. Kolln and Ms. Mattson. (Tr. 2431-2432, 2434-2436, 2439-2440, 2779-2783; CSH-R-3; CSH-R-7, CSH-R-8).

It is disingenuous of the Secretary to make statements in its Brief such as "UHS-DE was also concerned about" the workplace violence; "at the start of the OSHA investigation in this case, Cedar Springs reported the investigation to UHS-DE because it was aware that UHS-DE wanted "to know about all OSHA investigations." *See* Secretary's Brief, p. 34. The fact that UHS-DE *wanted to know about the OSHA investigation* is not evidence of interrelated and integrated safety and health matters. It is merely evidence that UHS-DE wanted to cooperate with OSHA, and not impede the investigation. *Johnson v. Flowers Indus., Inc.,* 814 F.2d 978, 981-82 (4th Cir. 1987) (finding entities separate where one "did not dominate the business practices" of the other because "exercise of general oversight does not permit disregard of the incidents of separate corporate entities").

Here, the evidence does not support a conclusion that Cedar Springs Hospital and UHS-DE handled safety matters as one company. Cedar Springs Hospital created its own WWVP, providing training on that policy and other related policies, and evaluated safety issues itself through, among other things, incident review and trending. (Tr. 62, 127, 295, 1815-1817, 1823, 2431-2432, 2434-2436, 2439-2440, 2521-2522, 2769-2773, 2783, 2779-2783; C-22). *See, e.g.*, *A.C. Castle Constr. Co. v. Acosta*, 882 F.3d 34, 42-43 (1st Cir. 2018) (finding that the two entities in question handled safety matters as one because one entity had no safety program of its own and had to rely on the other for safety trainings and safety policies); *Absolute Roofing*, 2013 OSAHRC LEXIS 77, at *9 (finding that the two entities in question handled safety matters as one company because the same individual responded to safety related issues for both companies); *C.T. Taylor*, 2003 OSAHRC LEXIS 43, at *11 (same); *see Loretto-Oswego*, 2011 OSAHRC LEXIS 1, at *11 (finding that Loretto-Oswego and affiliates did not handle safety matters as one company because Loretto-Oswego had its own safety committee and handled safety orientations for new employees itself).

As noted above, the ALJ Dec. failed to mention or acknowledge the significant distinctions between *Pembroke* and this case, including the presence of a UHS-DE Loss Control manager at Pembroke Hospital and the much broader scope of the CEO's duties at *Pembroke.* In addition, other differences include the evidence

in *Pembroke* that UHS-DE drafted the hospital's strategic plan. 2023 U.S. App. LEXIS 10930, at *7. The plan, which was submitted to the Department of Health, "describe[d] UHS-DE's implementation of patient care improvements[.]" *Id.* None of the evidence the Commission relied on in *Pembroke* supported a finding that the entities there handled safety matters as one company, and here, the types of evidence the Commission cited in *Pembroke* do not exist.

Case law makes clear that general oversight, supervision, and consultation by a parent corporation cannot sustain an allegation of single-employer status without greater, more specific ties. *See, e.g.*, *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997) ("The interrelation of operations element of the single employer test ultimately focuses on whether the parent corporation excessively influenced or interfered with the business operations of its subsidiary, that is, whether the parent actually exercised a degree of control beyond that found in the typical parent-subsidiary relationship.").

### 3. UHS-DE And Cedar Springs Do Not Share Common Management, Supervision, Or Ownership.

The Secretary's Brief and the ALJ Dec. also misstate and misapply the law in concluding that UHS-DE and Cedar Springs shared common ownership and management, simply because Cedar Springs is a wholly-owned subsidiary of Psychiatric Solutions Hospital, Inc., which is wholly owned by Universal Health Services, Inc., and UHS-DE is a management company that is wholly-owned by

UHS. *See* Stip. 17, 18. Throughout the Secretary's Brief, is a constant refrain that "UHS-DE and Cedar Springs share the same ultimate corporate parent." *See* Secretary's Brief, p. 20. ALJ Dec., p. 151. Simply put, the fact that UHS-DE and Cedar Springs share the same ultimate corporate parent does not mean that UHS-DE and Cedar Springs have common ownership and management. Instead, *the dispositive and undisputed fact* is that UHS-DE and Cedar Springs have no shared management employees. The Cedar Springs CEO and CFO – who were undisputedly UHS-DE employees – performed no executive functions for UHS-DE, period. Moreover, there is no record evidence of that they were even managed by UHS-DE.

The ALJ reasoned that Cedar Springs' CEO and CFO are employees of UHS-DE and "[k]ey oversight committees were either led by or had UHS-DE employees as members." ALJ Dec., p. 152. And once again, relying on *Pembroke* without applying independent fact-finding about this case, the ALJ held, "As in *UHS-DE/Pembroke*, there was a direct line of management between Cedar Springs and UHS-DE. The CEO supervised Cedar Springs employees and was, in turn, supervised by UHS-DE employees. This level of oversight suffices." ALJ Dec., p. 152 (emphasis added). However, the ALJ erred because the ALJ Dec. cites to no record evidence for this statement, and there is none. While there is evidence that UHS-DE employs the Cedar Springs CEO and CFO, there is no evidence in the

record that the "CEO in turn was supervised by UHS-DE employees" as found in the ALJ Dec. Instead, the parties stipulated that "the CEOs of Cedar Springs Hospital and UHS-DE were and are different individuals." (Stip. 22). The ALJ has no right to make bold statements of fact by inventing evidence to support the statement, and to do so was an abuse of discretion by the ALJ, which requires reversal. The Secretary cannot wildly speculate or guess that the CEO and CFO were supervised by UHS-DE employees when there is no record evidence of this. Further, while Cedar Springs' CEO and CFO are UHS-DE employees, they do not have any influence over the management and operations of UHS-DE.

*Loretto-Oswego* is once again instructive here. There, the management company, LMC, shared the same president and CEO at three of its nursing homes. *Loretto-Oswego*, 2011 OSAHRC LEXIS 1, at *8. Yet, even in that case, the Secretary did not contend that LMC should be cited for any violations. The Commission found it noteworthy that the "record show[ed] that on a day-to-day basis, administrative personnel at [the individual facility] operated independently of LMC," despite sharing management-level personnel. *Id.* Specifically, a facility employee had authority to hire, discipline, or fire facility employees, and the facility typically handled personnel issues in-house. *Id.*

Here, the relationship between UHS-DE and Cedar Springs is even more tenuous than the one between LMC and its nursing homes. There are no shared

management employees. UHS-DE does not have the same management structure as Cedar Springs. The Cedar Springs CEO and CFO were simply employees of UHS-DE hired to be Cedar Springs' CEO and CFO. They do not hold corporate management positions within the UHS-DE organization.

The facts are also similar to *FreightCar*, where the Commission found "no evidence showing that the two companies share a common president, management, supervision, or ownership" given that there was nothing in the record that "identified the occupants of these positions for FreightCar America, Inc." 2021 OSAHRC LEXIS 28, *14. Accordingly, there is no record evidence showing that the supervision and management of UHS-DE and Cedar Springs is shared. *See Southern Scrap*, 2011 OSAHRC LEXIS 91, at *105 (holding that the Secretary had failed to meet his burden as to the third factor given that there was "no evidence in the record showing that supervision or management at the two subsidiary companies' scrap yards was shared"). Accordingly, this Court should reverse the ALJ Dec. and the Commission's Final Order.

## II. THE COMMISSION IGNORED THE "NECESSARY CONTEXT."

As discussed above, there is insufficient evidence supporting the three-factor single-employer test. When the record evidence is considered as a whole, it is undisputed that UHS-DE is a hospital-management company that provides administrative and back-office support services to the hospitals with which it

contracts, including Cedar Springs.  But it is Cedar Springs that carries out the work of managing patient care and administering clinical treatment.

The Commission has recognized this type of relationship in the healthcare setting and has characterized this as "the branding practice among other affiliated enterprises where there is a common brand name but independent commercial enterprises carry out the work," and reasoned that this is insufficient to prove single-employer status. *FreightCar*, 2021 OSAHRC LEXIS 28, at *15. To hold otherwise curtails the ability of corporate parents to hire specialized entities to provide health programs, sample training materials, and other high-level support to subsidiaries and related companies.  The substantial benefits gained from the ability to share these resources across multiple companies would be chilled if single employment were created by this type of arrangement.

In addition, the facts of this case cannot be considered in a vacuum without first placing them "in the necessary context." *Id.* at *14 (noting that "'with respect to operations and safety and health matters,' much of the record evidence lacks the necessary context").  By issuing the citation, OSHA is attempting to superimpose its regulatory powers on the healthcare industry without an actual standard, which is

already subject to extensive regulation and oversight by the appropriate state, federal, and local entities.[4]

The parties stipulated that Cedar Springs Is "certified as a Medicare and Medicaid hospital by the federal centers for Medicare and Medicaid Services." ("CMS"). (Stip. 12). In addition, the parties stipulated that Cedar Springs "is regulated by Colorado state agencies, including the Department of Public Health and Environment and the Office of Behavioral Health." (Stip. 13). And the parties stipulated that Cedar Springs "is accredited by The Joint Commission (TJC) per its standards." (Stip. 14). The parties stipulated that "[a]s a CMS-certified hospital, Cedar Springs is subject to Medicare Conditions of Participation and Conditions for coverage, which are federal regulations intended to ensure quality standards in hospitals." (Stip. 15). The parties further stipulated that "As a CMS-certified hospital, Cedar Springs is required to annually submit data to CMS regarding, among other things, its patient days, revenue, number of employees, salaries and benefits paid, and revenue." (Stip. 16).

Those entities, including Colorado's Department of Public Health and Environment and the Office of Behavioral Health, and the Joint Commission

---

[4] OSHA is attempting to impose additional, conflicting regulations by citing Respondents under the General Duty Clause, which will produce great uncertainty on the part of psychiatric hospitals and other healthcare organizations about their duties and deprives the healthcare industry of the opportunity to engage in notice and comment rulemaking to develop feasible, evidence-based standards.

(maintaining accreditation being a necessary condition of participation with the Center for Medicare and Medicaid Services (CMS)), have the specialized knowledge and expertise to understand and appreciate the environment in which behavioral health institutions, such as Cedar Springs, operate and the unique needs of the patients whom they treat. It is with this knowledge and expertise that these entities can most appropriately regulate and oversee Cedar Springs without stifling its mission or its ability to provide patient care to a vulnerable population.

In issuing the citation in this case, OSHA is attempting to impose itself as a key player in that healthcare regulatory field without having the benefit of the specialized knowledge and expertise required to regulate and oversee medical institutions or a mandate from Congress to do so. OSHA is effectively encroaching on matters that pertain to clinical treatment and stifling UHS-DE's ability to provide the proper consultative and administrative support to Cedar Springs. *See, e.g.*, *Am. Dental Ass'n v. Sec'y of Labor*, 984 F.2d 823, 825 (7th Cir. 1993) (cautioning OSHA to limit citations to "those that would materially reduce a significant risk to human health without imperiling the existence of, or threatening massive dislocation to, the healthcare industry"). Accordingly, this Court should grant discretionary review and reverse the ALJ Dec.

## ADOPTION OF CEDAR SPRING'S REPLY BRIEF

Pursuant to Fed. R. App. P. 28(i), UHS-DE joins in and adopts the arguments set forth in Co-Petitioner Cedar Spring's Reply Brief and incorporates them herein by reference.

## CONCLUSION

For all of the above reasons, the Tenth Circuit should reverse the ALJ's Decision and Final Order of the Commission.

Respectfully submitted,

LEWIS BRISBOIS BISGAARD
& SMITH LLP

*/s/ Kip J. Adams*
Kip J. Adams
Patricia B. Gary
Lewis Brisbois Bisgaard & Smith LLP
One International Place, Suite 350
Boston, MA 02110
T: (857) 313-3950
Kip.Adams@lewisbrisbois.com
Patricia.Gary@lewisbrisbois.com

*Attorneys For Petitioner UHS of Delaware, Inc.*

## CERTIFICATE OF COMPLIANCE

1.    This Brief complies with the type-volume limitation of Fed. R. App. P. *32(g)*, and the word limit of Fed. R. App. P.  *5(a)(7)(B)(ii)* because, excluding the parts of the document exempted by Fed. R. App. P. *32 (f)*, this document contains 5,733 total non-excluded words.

2.     This Brief complies with the typeface requirements of Fed. R. App. P. 32*(a)(5)* and the type style requirements of Fed. R. App. P. 32*(a)(6)* because it has been prepared in a proportionally spaced typeface using Microsoft Word version 2202, build 14931.20724 in size 14 font of Times New Roman.

*/s/ Kip J. Adams*
Kip J. Adams

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2025, I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

*Counsel for The Secretary of Labor*

Louise M. Betts, Esq
Heather R. Phillips, Esq.
Office of the Solicitor, U.S. DOL
200 Constitution Ave., NW, Room S4004
Washington, D.C. 20210
betts.louise@dol.gov
phillips.heather@dol.gov


*Counsel for Cedar Springs Hospital, Inc. d/b/a*
*Cedar Springs Hospital*

Dion Y. Kohler, Esq.
Jackson Lewis, P.C.
171 17th Street, N.W., Suite 1200
Dion.Kohler@jacksonlewis.com

*/s/ Kip J. Adams*
Kip J. Adams
